**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SHAUNTIL COX,<br><br>Plaintiff,<br><br>v.<br><br>JASON HUTCHINS and LARRY SANDERS,<br>each in his individual capacity,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.<br>4:26-cv-____________<br><br>**JURY DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Shauntil Cox files this Original Complaint against Defendants Jason Hutchins and Larry Sanders, each in his individual capacity, and respectfully shows the Court as follows:

## I. NATURE OF THE ACTION

1. This is a civil rights action under 42 U.S.C. § 1983 for the unreasonable seizure of, and excessive force against, Plaintiff by an on-duty, uniformed, and armed police officer of the City of Roman Forest, Texas. Plaintiff also asserts a claim under Texas law against Defendant Larry Sanders, a member of the Roman Forest City Council, for assault by offensive physical contact committed against her inside Roman Forest City Hall on December 31, 2025.

2. On January 6, 2026, Plaintiff, a civilian Court Clerk for the City of Roman Forest, was inside Roman Forest City Hall reporting, at the direction of the

City's human-resources officer, an unwanted physical contact that Defendant Larry Sanders, a City Councilmember, had made with her six days earlier. Defendant Jason Hutchins—an on-duty, uniformed, armed Roman Forest police officer—approached Plaintiff, reached for and partially drew his holstered firearm, and then seized Plaintiff by the back of the neck and marched her down a hallway under his physical control. When Plaintiff protested, Hutchins squeezed her neck with escalating force until she lost her vision, her hearing, and consciousness. Plaintiff was not suspected of any crime, was not resisting, and posed no threat to anyone.

3. Plaintiff seeks compensatory and punitive damages, attorney's fees, and costs against Hutchins, and compensatory damages against Sanders.

## II. PARTIES

4. Plaintiff Shauntil Cox is an individual and a citizen of Texas residing in Porter, Montgomery County, Texas. At all relevant times, Plaintiff was employed by the City of Roman Forest, Texas (the "City"), as a Court Clerk and worked at Roman Forest City Hall.

5. Defendant Jason Hutchins is an individual and a citizen of Texas. At all relevant times, Hutchins was a licensed Texas peace officer employed by the City of Roman Forest Police Department, holding the rank of Specialist and assigned to the Department's investigations division. Hutchins has been a law enforcement officer since approximately 2008, holds a Master Peace Officer certification from the Texas Commission on Law Enforcement, and is a certified firearms instructor.

Hutchins is sued in his individual capacity. He may be served with process wherever he may be found.

6. Defendant Larry Sanders is an individual who, on information and belief, resides in Montgomery County, Texas, and is a citizen of Texas. At all relevant times, Sanders was an elected member of the Roman Forest City Council, holding Position 5, a seat to which he was elected in November 2024. Sanders is sued in his individual capacity only, for his own tortious conduct. He may be served with process wherever he may be found.

7. At all relevant times, Hutchins acted under color of state law, as more fully alleged below.

## III. JURISDICTION AND VENUE

8. This Court has original subject-matter jurisdiction over Plaintiff's claims under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4) because those claims arise under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

9. This Court has supplemental jurisdiction over Plaintiff's state-law claim against Sanders under 28 U.S.C. § 1367(a) because that claim is so related to the federal claims that it forms part of the same case or controversy. Section 1367(a) expressly extends to "claims that involve the joinder or intervention of additional parties." Both incidents occurred inside Roman Forest City Hall within a single week; both involved unconsented physical contact by a City official with Plaintiff's head or neck; Plaintiff was in the very act of reporting Sanders's conduct, at the direction of the City's human-resources officer, when Hutchins seized her; the two

incidents share the same internal reporting chain and overlapping witnesses, including City Administrator Scott Castleberry and human-resources officer Marie Campbell; and Plaintiff's emotional injuries from the two incidents are intertwined.

10. This Court has personal jurisdiction over each Defendant because each committed the acts complained of in Texas and, on information and belief, each resides in Texas.

11. Venue is proper in the Southern District of Texas, Houston Division, under 28 U.S.C. § 1391(b)(2) because all of the events giving rise to Plaintiff's claims occurred in Roman Forest, Montgomery County, Texas, which lies within the Houston Division. 28 U.S.C. § 124(b)(2). On information and belief, venue is also proper under 28 U.S.C. § 1391(b)(1) because both Defendants reside in this District and are residents of Texas.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's Employment with the City of Roman Forest

12. Plaintiff began her employment with the City on October 4, 2023.

13. As Court Clerk, Plaintiff's duties included clerical duties for the City's municipal court and receiving visitors at the City Hall door.

14. Roman Forest City Hall, located at 2430 Roman Forest Boulevard, houses the City's administrative offices, its municipal court and courtroom, and the office of the City Secretary and human-resources officer, Marie Campbell. At all relevant times the Roman Forest Police Department was also headquartered at City Hall, and its officers, including Hutchins, worked out of that building.

## B. Defendant Hutchins

15. Hutchins joined the Roman Forest Police Department in or about 2020, after prior service with the Baytown Police Department and a Harris County Constable's Office.

16. By virtue of his training and certifications—including his Master Peace Officer certification and his certification as a firearms instructor—Hutchins was trained in, and thoroughly familiar with, the constitutional limits on a peace officer's use of force, including that force may not be used against a person who is compliant, is not resisting, poses no threat, and is not suspected of any crime.

17. Hutchins was also trained in, and familiar with, the danger of applying pressure to the neck, including that compression of the neck can cause loss of consciousness, serious bodily injury, or death.

18. Hutchins and Plaintiff had a work-only relationship. They were not friends, had no history of joking or horseplay, and had no personal dispute of any kind. Their only prior physical contact occurred on two occasions when Plaintiff was ill and Hutchins, who said he had EMT training from military service, briefly checked her for swelling—once under her arms, and once, at her request, at her throat in connection with a thyroid condition. Nothing in that history resembled, invited, or explains the force Hutchins used on January 6, 2026.

## C. December 31, 2025: Defendant Sanders Grabs Plaintiff's Head Without Consent

19. On December 31, 2025, Defendant Larry Sanders, a member of the Roman Forest City Council, came to the City Hall office where Plaintiff was working. No City Council meeting was taking place.

20. Sanders spoke with Plaintiff for about fifteen minutes. During the conversation, Plaintiff mentioned that she had a headache. Sanders waved Plaintiff over and said, "Come here, I want to show you something." When Plaintiff approached, Sanders told her, "Face that way," directing her to face the wall.

21. Without asking, without telling Plaintiff what he intended to do, and without her consent, Sanders grabbed Plaintiff's head and pressed his fingers high up on the back of her skull. The physical contact lasted one to two minutes.

22. Plaintiff immediately felt very dizzy and asked, "What was that? What did you just do?" Sanders answered, "I did reiki." Plaintiff told Sanders that she associated reiki with witchcraft and did not like it.

23. Plaintiff had not asked Sanders to touch her, did not agree to be touched, and was given no opportunity to refuse before the contact occurred. Stepping over and turning toward the wall when a City Councilmember told her to was not consent to having her head grabbed. Plaintiff regarded the contact as offensive and unwelcome, and a reasonable person in Sanders's position would have known that a City employee at work would regard an unannounced grab of her head by a councilmember as offensive or provocative.

24. Laying hands on City employees, and performing "reiki" or any other practice on their bodies, is not a duty, function, or responsibility of the office of City Councilmember. The City's ordinance setting out the duties of the City Administrator provides that no individual Councilmember has the right to direct any department head or subordinate employee of the City, that Councilmembers deal with the City's administrative services solely through the City Administrator except for the purpose of inquiry, and that no Councilmember may give orders to any City employee, publicly or privately. On information and belief, no other ordinance, resolution, or action of the City Council, and no other competent authority, assigned Sanders any task of examining, treating, or touching City employees.

25. Sanders served on the City Council as an elected official. He received no salary, stipend, or other compensation from the City for his service as a Councilmember, and he was not in the paid service of the City on December 31, 2025. On information and belief, the City is a general-law Type A municipality. The City's published budget documents for fiscal year 2025–2026, which ran from October 1, 2025, through September 30, 2026, contain no salary, stipend, per-meeting, per-diem, or allowance line item for Councilmembers; the only line item in those documents tied to an elected official is designated for the Mayor.

26. Plaintiff became dizzy, shaky, flushed, and nauseous, and her heart raced.

27. That same day, Plaintiff reported Sanders's conduct to City Administrator Scott Castleberry, with Marie Campbell and Police Captain Jeff Campbell present.

28. Plaintiff felt too ill to complete her workday and went home.

### D. January 6, 2026: Plaintiff Is Directed to Report the Sanders Incident

29. On January 6, 2026, Marie Campbell instructed Plaintiff to tell co-worker Joshua Wright, the City's Permit Technician and Code Enforcement officer, about the Sanders incident.

30. Plaintiff complied. She met with Mr. Wright in Ms. Campbell's human-resources office at City Hall and began describing what Sanders had done to her.

31. While Plaintiff was speaking with Mr. Wright, the City Hall doorbell rang. Plaintiff left the human-resources office and walked through the municipal courtroom toward the door to answer it.

32. As Plaintiff reached the open door leading to the hallway, the bell was rung repeatedly. From the manner of the ringing, Plaintiff understood that the person at the door was not a member of the public but someone from the City who was accustomed to the building. Plaintiff stopped and stood still.

### E. Hutchins Seizes Plaintiff by the Neck and Chokes Her to Unconsciousness

33. Plaintiff then saw Hutchins coming down the hallway toward her.

34. At the time, Hutchins was on duty as a Roman Forest police officer, was in uniform, and was armed with his department-issued firearm carried in a

holster on his duty belt. Plaintiff does not know why Hutchins came to that part of City Hall. On information and belief, City Hall security video that Police Chief Stephen Carlisle described to Plaintiff shows Hutchins leaving, changing course, and pulling his vehicle up in front of the City Hall doors.

35. Plaintiff was not engaged in any argument or dispute with Hutchins. She pivoted to the side of the hallway to allow him to pass.

36. Hutchins did not pass. As he approached Plaintiff, Hutchins reached to his holster and partially drew his firearm from it, then pushed the firearm back into the holster. Hutchins then grabbed Plaintiff by the back of her neck with his left hand.

37. Plaintiff did not see Hutchins partially draw his firearm at the time; she learned of it afterward when she was shown video of the incident, as alleged below. Plaintiff did see, at all times, that Hutchins was a uniformed police officer carrying a firearm on his duty belt.

38. Maintaining his grip on the back of Plaintiff's neck, Hutchins physically escorted Plaintiff down the hallway toward Ms. Campbell's human-resources office, controlling the direction and pace of her movement by the pressure of his hand on her neck, as an officer escorts a detainee.

39. Plaintiff did not resist, did not pull away, did not strike or threaten Hutchins, and did not attempt to flee. She was not free to leave, and she submitted to Hutchins's physical control over her because he was an armed police officer.

40. Hutchins gave Plaintiff no explanation, did not tell her she was under arrest or being detained, and did not accuse her of any offense. He said nothing to her as he took hold of her and moved her; he steered her only by squeezing the back of her neck.

41. As Hutchins moved Plaintiff by the neck to where Mr. Wright was, Plaintiff said: "I don't know why men think they can do this to me."

42. In direct response to Plaintiff's statement, Hutchins squeezed the back of Plaintiff's neck harder, and then harder still.

43. Hutchins squeezed Plaintiff's neck with such force that Plaintiff lost her vision, lost her hearing, and lost consciousness. Plaintiff remained upright only because Hutchins was holding her.

44. While Plaintiff was unconscious or semi-conscious, Hutchins scratched her head in a circular motion and then, with her hair wrapped fully around his hand, pulled her by the hair three times, harder each time.

45. As Plaintiff began to regain awareness, and while her hearing was still muffled, Hutchins asked her, "How do you feel about that?" or words to that effect.

46. Hutchins then released Plaintiff and shoved her forward, causing her body to pitch forward.

47. At no point during the encounter was Plaintiff suspected of any crime, subject to any warrant, or the subject of any lawful order. Plaintiff was unarmed, was a civilian employee at her own place of work, posed no threat to Hutchins or to anyone else, and was fully compliant throughout.

48. There was no law-enforcement justification of any kind for Hutchins to lay hands on Plaintiff, to move her by the neck, to compress her neck, or to use any force against her whatsoever.

49. Hutchins's escalation of force in response to Plaintiff's verbal protest, and his taunting question to her as she regained consciousness, demonstrate that Hutchins acted intentionally, maliciously, and with the purpose of causing Plaintiff pain, fear, and injury.

50. Plaintiff stood still in shock and then walked to Ms. Campbell's human-resources office, about three feet away. Minutes later, Hutchins came to the human-resources office and spoke with Ms. Campbell. After Hutchins left, Mr. Wright, who had witnessed Hutchins pulling Plaintiff by the hair, told Ms. Campbell, "I just witnessed the biggest HR situation ever." City Administrator Castleberry came in, and Plaintiff and Mr. Wright told him what had happened. Plaintiff filed a complaint, and the City began an investigation.

### F. The Incident Was Captured on Video

51. The January 6, 2026 incident was captured on video by the Roman Forest City Hall security cameras.

52. On January 27, 2026, after Plaintiff was interviewed by a Texas Ranger about the incident, Chief Carlisle showed Plaintiff the video. The video shows Hutchins approaching Plaintiff, partially drawing his firearm from its holster and pushing it back in with his left hand, grabbing Plaintiff by the back of the neck with the same left hand, and walking her down the hallway by the neck.

### G. Plaintiff's Injuries

53. As a direct and proximate result of Hutchins's conduct, Plaintiff suffered physical pain and injury to her neck and head, loss of vision, hearing, and consciousness, and the forcible pulling of her hair.

54. Plaintiff had a pre-existing neck condition that was fully treated with injections in 2019. From 2019 until January 6, 2026, Plaintiff needed no further treatment and had no problems with that condition.

55. Hutchins's compression of Plaintiff's neck and his shoving of her body directly and proximately aggravated that previously resolved condition to the point that Plaintiff now requires surgery. On January 27, 2026, Plaintiff's condition worsened and she went to the hospital, where a CT scan showed ischemic changes in her brain.

56. As a direct and proximate result of Hutchins's conduct, Plaintiff has suffered and continues to suffer physical pain, mental anguish, emotional distress, fear, humiliation, loss of enjoyment of life, medical expenses, and loss of earning capacity, and will continue to incur such damages in the future.

## V. CAUSES OF ACTION

**COUNT I**
**42 U.S.C. § 1983 — Unreasonable Seizure and Excessive Force in Violation of the Fourth and Fourteenth Amendments**
(Against Defendant Hutchins in His Individual Capacity)

57. Plaintiff incorporates the foregoing paragraphs by reference.

58. The Fourth Amendment, applicable to the States through the Fourteenth Amendment, guarantees the right to be free from unreasonable seizures, including the use of excessive force in the course of a seizure.

59. *Under color of law*. Hutchins acted under color of state law. He did not strike Plaintiff in a personal quarrel; he took physical custody of her. Without a word, he seized her by the back of the neck and walked her down a City Hall hallway, controlling the direction and pace of her movement as an officer escorts a detainee, and Plaintiff submitted to that control, rather than resisting or leaving, because he was a uniformed, armed police officer. Immediately before taking hold of her, Hutchins reached for and partially drew his department-issued firearm, conduct that objectively signaled he was acting as an armed officer, whether or not Plaintiff saw it at that moment. He did all of this on duty, in uniform, and armed. There was no personal relationship, dispute, or horseplay between them to which the conduct could be attributed. Hutchins thus misused power that he possessed by virtue of state law, and police authority was the very means by which he accomplished the seizure. *See West v. Atkins*, 487 U.S. 42, 49 (1988); *Gomez v. Galman*, 18 F.4th 769, 776 (5th Cir. 2021); *Bustos v. Martini Club Inc.*, 599 F.3d 458, 464–65 (5th Cir. 2010); *United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir. 1991); *Bennett v. Pippin*, 74 F.3d 578, 589 (5th Cir. 1996).

60. *Seizure.* Hutchins seized Plaintiff within the meaning of the Fourth Amendment. He intentionally applied physical force to Plaintiff's body—grabbing the back of her neck—with the objective intent to restrain her and to control her

movement, and he did in fact restrain her, walking her down the hallway by the neck and dictating the direction and pace of her movement. Plaintiff was not free to leave. *See Torres v. Madrid*, 592 U.S. 306, 309, 317 (2021); *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989). Hutchins's subjective reasons for seizing Plaintiff are irrelevant to whether the force he used was reasonable. *Graham v. Connor*, 490 U.S. 386, 397 (1989). The seizure was itself unreasonable: Hutchins had no warrant, no probable cause, and no reasonable suspicion that Plaintiff had committed, was committing, or was about to commit any offense (¶¶30, 37). *See Brown v. Texas*, 443 U.S. 47, 51–53 (1979).

61. *Injury.* Plaintiff suffered injuries that were more than de minimis, including loss of consciousness, loss of vision and hearing, pain and injury to her neck and head, and the aggravation of a pre-existing condition to the point of requiring surgery.

62. *Force clearly excessive to the need.* Every relevant factor weighs against any use of force: Plaintiff was not suspected of any crime, let alone a severe one; she posed no immediate threat to the safety of Hutchins or anyone else; and she was not actively resisting or attempting to evade a seizure by flight. *Graham*, 490 U.S. at 396. Because there was no legitimate need for any force, all force used was clearly excessive.

63. *Objectively unreasonable.* Grabbing a compliant, unarmed civilian by the neck, forcibly moving her, squeezing her neck with escalating pressure in response to a verbal protest until she loses consciousness, scratching her head and

pulling her hair while she is unconscious, and then shoving her forward is objectively unreasonable under the totality of the circumstances. No reasonable officer could have believed that any of this force was lawful.

64. Hutchins's conduct directly and proximately caused Plaintiff's injuries and damages as alleged herein.

65. Hutchins acted intentionally and maliciously, and with reckless and callous indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

**COUNT II**
**42 U.S.C. § 1983 — Violation of the Right to Bodily Integrity Under the Substantive Component of the Fourteenth Amendment's Due Process Clause**
(Against Defendant Hutchins in His Individual Capacity — Pleaded in the Alternative)

66. Plaintiff incorporates the foregoing paragraphs by reference.

67. Pursuant to Federal Rule of Civil Procedure 8(d)(2), this Count is pleaded in the alternative to Count I and only to the extent the Court determines that Hutchins's conduct did not constitute a seizure within the meaning of the Fourth Amendment. Plaintiff acknowledges that if the Fourth Amendment governs, it provides the exclusive constitutional framework for her excessive-force claim. *Graham*, 490 U.S. at 395.

68. The substantive component of the Fourteenth Amendment's Due Process Clause protects the right to bodily integrity against intentional physical abuse by state actors. *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450–52 (5th Cir. 1994) (en banc).

69. This is not a claim that the City failed to provide Plaintiff a safe workplace. It is a claim that a state actor, acting under color of law, intentionally and physically abused Plaintiff's body.

70. Hutchins, acting under color of state law as alleged in Count I, intentionally grabbed Plaintiff by the neck, compressed her neck with escalating force in response to her verbal protest until she lost consciousness, scratched her head and pulled her hair while she was unconscious, taunted her as she regained awareness, and shoved her forward.

71. Hutchins had ample opportunity to deliberate. His conduct was not a split-second reaction to any emergency, threat, or exigency; it was a deliberate, sustained, and escalating application of force against a compliant civilian co-worker, undertaken with the intent to cause her pain, fear, and injury.

72. Hutchins's conduct was arbitrary, served no legitimate governmental objective, was intended to injure in a way unjustifiable by any government interest, and was so egregious and outrageous that it shocks the contemporary conscience. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–49 (1998).

73. Hutchins's conduct directly and proximately caused Plaintiff's injuries and damages as alleged herein, and was undertaken with malice and with reckless and callous indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.

**COUNT III**
**Assault (Offensive Physical Contact) Under Texas Law**
(Against Defendant Sanders in His Individual Capacity)

74. Plaintiff incorporates paragraphs 1 through 30 by reference.

75. Under Texas law, the elements of civil assault mirror those of criminal assault. *Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012). A person commits an assault when he intentionally or knowingly causes physical contact with another when he knows or should reasonably believe that the other will regard the contact as offensive or provocative. Tex. Penal Code § 22.01(a)(3).

76. On December 31, 2025, Sanders intentionally and knowingly caused physical contact with Plaintiff by grabbing her head and pressing his fingers high up on the back of her skull for one to two minutes, after directing her to face the wall, and then telling her, "I did reiki."

77. Sanders knew or should reasonably have believed that Plaintiff would regard the contact as offensive or provocative. Sanders did not ask for, and Plaintiff did not give, consent to the contact. He gave her no warning of it, and he had directed her to face the wall before he grabbed her head. Plaintiff did in fact regard the contact as offensive and told him so.

78. Sanders's conduct was not within the general scope of any employment or office he held. The office of City Councilmember carries no duty, function, or authority to touch City employees, to lay hands on their heads, or to perform "reiki" or any other practice on their bodies, and no competent authority assigned Sanders any such task. Viewed objectively, the contact had no connection to any duty of his office; it was an independent course of conduct that served no purpose of the City. *See* Tex. Civ. Prac. & Rem. Code § 101.001(5); *Laverie v. Wetherbe*, 517 S.W.3d 748, 753 (Tex. 2017); *Garza v. Harrison*, 574 S.W.3d 389, 400 (Tex. 2019).

79. Independently, Sanders is not an "employee" of a governmental unit within the meaning of Tex. Civ. Prac. & Rem. Code § 101.001(2) because he was not "in the paid service" of the City, and § 101.106(f) therefore has no application to him. *See Harris County v. Dillard*, 883 S.W.2d 166, 167 (Tex. 1994) (volunteer reserve deputy who was "not in the paid service" of the county was not an "employee" under the Tort Claims Act's definition, then codified at § 101.001(1)); *Maldonado v. City of Pearsall*, 977 F. Supp. 2d 646, 652 (W.D. Tex. 2013) (denying at the pleading stage councilmember's motion to dismiss city employee's assault, battery, and false-imprisonment claims under § 101.106: where city charter provided that council members shall not "receive compensation" and movant did not show he was "in the paid service of a governmental unit," he had not shown he was an "employee" under § 101.001(2)); *id.* at 652–53 (alternatively, complaint's allegations did not indicate he was discharging council duties when he allegedly slapped plaintiff).

80. Grabbing a City employee's head to perform reiki was not the performance of any discretionary duty of Sanders's office and was not within the scope of his authority.

81. Sanders's conduct directly and proximately caused Plaintiff offense, fear, humiliation, and mental anguish, for which she seeks compensatory damages, including at least nominal damages.

## VI. HUTCHINS IS NOT ENTITLED TO QUALIFIED IMMUNITY

82. Although Plaintiff is not required to anticipate the affirmative defense of qualified immunity in her complaint, she pleads the following so that the Court may resolve any such defense on the pleadings if raised.

83. The facts alleged above, taken as true, establish that Hutchins violated Plaintiff's clearly established constitutional rights, and that no reasonable officer in Hutchins's position could have believed his conduct was lawful.

84. Long before January 6, 2026, it was clearly established in the Fifth Circuit that a police officer may not use force—let alone force to the neck sufficient to cause unconsciousness—against a person who is not resisting, is not attempting to flee, poses no threat, and is not suspected of any crime. *See, e.g.*, *Newman v. Guedry*, 703 F.3d 757, 763–64 (5th Cir. 2012) (force against a person who committed no crime, posed no threat, and did not resist); *Darden v. City of Fort Worth*, 880 F.3d 722, 731–33 (5th Cir. 2018) (violently slamming, choking, or striking a suspect who is not actively resisting); *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 341–42 (5th Cir. 2020) (officers may not physically strike a suspect who is not resisting); *Timpa v. Dillard*, 20 F.4th 1020, 1034–38 (5th Cir. 2021) (continuing to kneel on the back of an individual who has been subdued); *Hanks v. Rogers*, 853 F.3d 738, 746–47 (5th Cir. 2017) (abrupt takedown of a person offering, at most, passive resistance during a minor traffic stop); *Ramirez v. Martinez*, 716 F.3d 369, 378–79 (5th Cir. 2013) (force after the arrestee was restrained and handcuffed); *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (reversing Rule

12(b)(6) dismissal where officers threw a motorist who was not physically resisting onto the ground, kneed him in the back, and pushed his face into the concrete); *Sam v. Richard*, 887 F.3d 710, 714 (5th Cir. 2018) ("pushing, kneeing, and slapping a suspect who is neither fleeing nor resisting is excessive").

85. It was equally clearly established, decades before January 6, 2026, that, absent a recognized exception such as a seizure carried out under a plan embodying explicit, neutral limitations on officers' conduct, a police officer may not physically seize and detain a person without at least reasonable suspicion, based on specific and articulable facts, that the person is involved in criminal activity. *Brown*, 443 U.S. at 51–53; *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Hutchins had none.

86. Those authorities involved persons who were at least suspected of some offense or subject to some lawful detention. Plaintiff was neither. Where the law prohibits force against a non-resisting, non-threatening suspect, it necessarily and obviously prohibits the same force against a non-resisting, non-threatening civilian employee who is suspected of nothing at all. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (officials can be on notice that their conduct violates established law even in novel factual circumstances); *Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020) (per curiam) (no factually identical precedent required where the constitutional violation is obvious).

87. It was likewise clearly established long before January 6, 2026, that the Fourteenth Amendment protects "[t]he right to be free of state-occasioned damage to a person's bodily integrity," *Doe*, 15 F.3d at 450–51 (quoting *Shillingford*

*v. Holmes*, 634 F.2d 263, 265 (5th Cir. Unit A 1981)); *Jefferson v. Ysleta Indep. Sch. Dist.*, 817 F.2d 303, 305 (5th Cir. 1987), including against "state-occasioned restraints which are not justified by the victim's conduct or other extenuating circumstances," *Jefferson*, 817 F.2d at 305, and that this protection reaches a police officer's malicious use of physical force, grossly disproportionate to any need, against a person he has not seized, amounting to an abuse of official power that shocks the conscience. *See Petta v. Rivera*, 143 F.3d 895, 900–02 (5th Cir. 1998) (recognizing a Fourteenth Amendment substantive-due-process excessive-force claim by persons who were not seized, judged by whether the force was grossly disproportionate to the need and inspired by malice so as to shock the conscience); *id.* at 899, 911 (granting qualified immunity only because, in 1990, a right to be free from force causing purely psychological harm was not clearly established); *Checki v. Webb*, 785 F.2d 534, 538 (5th Cir. 1986) (officer who, "with malicious abuse of official power shocking to the conscience," uses a police vehicle to terrorize a civilian may be liable under § 1983).

88. Settled Fifth Circuit law also confirms that Hutchins acted under color of state law. An officer who uses his police status and the physical authority of his office to commit an act of violence acts under color of state law, regardless of his duty status. *Tarpley*, 945 F.2d at 809; *Bennett*, 74 F.3d at 589. The Fifth Circuit asks whether the officer misused or abused his official power and whether there is a nexus between the victim, the improper conduct, and the officer's performance of official duties. *Bustos*, 599 F.3d at 464–65. Both are present here: Hutchins took

physical custody of a compliant civilian, walked her by the neck as an officer escorts a detainee, and did so on duty, in uniform, and armed, after reaching for his firearm; he used the physical authority of a police officer to seize, restrain, and move a compliant civilian who submitted to him because of that authority.

89. The cases on which an officer-defendant might rely to argue otherwise are inapposite. In *Delcambre v. Delcambre*, 635 F.2d 407, 408 (5th Cir. Unit A 1981) (per curiam), a police chief's assault arising from an argument over family and political matters was held not to be under color of law because the victim "was neither arrested nor threatened with arrest." Here, by contrast, there was no personal or political dispute, and Plaintiff was physically seized and restrained—walked down a hallway by the neck by an armed officer who had just reached for his firearm. In *Townsend v. Moya*, 291 F.3d 859, 861–62 (5th Cir. 2002) (per curiam) (quoting *Harris v. Rhodes*, 94 F.3d 196, 197 (5th Cir. 1996) (per curiam)), a state-prison lieutenant cut an inmate with a pocketknife during undisputed horseplay, an act with a "purely private aim and no misuse of state authority." Here, there was no horseplay, and Hutchins's misuse of police authority was the means of the seizure. And in *Bustos*, 599 F.3d at 464–66, an off-duty officer, not in uniform and without any official weapon or assertion of authority, was involved in a barroom altercation in which "no 'air of authority' pervaded." Every one of those missing indicia of authority is present here.

90. Given Hutchins's more than 17 years of law-enforcement experience, his Master Peace Officer certification, and his training as an instructor, the

unlawfulness of choking a compliant, unarmed civilian employee to unconsciousness would have been apparent to any reasonable officer in his position, and was apparent to him.

## VII. DAMAGES

91. As a direct and proximate result of Hutchins's conduct, Plaintiff has suffered and seeks recovery of the following damages, in amounts to be determined by the jury:

(a) Past and future physical pain and suffering;

(b) Past and future mental anguish and emotional distress;

(c) Past and future medical expenses, including the cost of surgery necessitated by the aggravation of Plaintiff's pre-existing condition;

(d) Past and future physical impairment;

(e) Past lost wages and future loss of earning capacity;

(f) Punitive damages against Hutchins under 42 U.S.C. § 1983;

(g) Reasonable attorney's fees and costs under 42 U.S.C. § 1988(b); and

(h) Pre-judgment and post-judgment interest as allowed by law.

92. As a direct and proximate result of Sanders's conduct, Plaintiff has suffered and seeks recovery of compensatory damages, in an amount to be determined by the jury, for past mental anguish, emotional distress, fear, and humiliation, together with pre-judgment and post-judgment interest as allowed by law.

## VIII. JURY DEMAND

93. Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Shauntil Cox respectfully requests that Defendants Jason Hutchins and Larry Sanders be cited to appear and answer, and that upon final trial Plaintiff have judgment against Defendants as follows:

(a) Compensatory damages against Hutchins and Sanders in amounts to be determined at trial;

(b) Punitive damages against Hutchins in his individual capacity in an amount to be determined at trial;

(c) Reasonable attorney's fees and costs of court pursuant to 42 U.S.C. § 1988(b) and as otherwise allowed by law;

(d) Pre-judgment and post-judgment interest at the maximum rates allowed by law; and

(e) Such other and further relief, at law or in equity, to which Plaintiff may show herself justly entitled.

Dated: November 18, 2026

Respectfully submitted,

**GRABLE PLLC**

*/s/ Brandon J. Grable*
Brandon J. Grable
Attorney-in-Charge
Texas State Bar No. 24086983
S.D. Tex. Bar No. 3246103
12451 Starcrest Drive, Suite 206
San Antonio, Texas 78216
Tel: (210) 963-5297
Fax: (726) 215-4765
brandon@grable.law

and

Solomon M. Radner
Michigan Bar No. P73653
Radner Law Group, PLLC
17515 W. Nine Mile Road, Suite 1050
Southfield, Michigan 48075
Tel: (877) 723-6375
Fax: (866) 571-1020
solomon@radnerlawgroup.com

**ATTORNEYS FOR PLAINTIFF SHAUNTIL COX**